IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

* * * * * * * * *

| | | |
|---|---|---|
| B.J. BARNES & SONS TRUCKING, INC., An Idaho corporation, | ) ) ) | Civil No. 2:05-CV-351BSJ |
| Plaintiff, | ) ) | **MEMORANDUM OPINION & ORDER RE: MOTIONS FOR** |
| vs. | ) ) | **SUMMARY JUDGMENT** **(Fed. R. Civ. P. 56)** |
| | ) | |

DAIRY FARMERS OF AMERICA, ) 
INC., a Kansas cooperative corporation, )

Defendant. )

┌─────────────────────────────────┐
│             **FILED**            │
│   CLERK, U.S. DISTRICT COURT     │
│    May 19, 2006 (4:20pm)         │
│     DISTRICT OF UTAH             │
└─────────────────────────────────┘

* * * * * * * * *

On May 12, 2006, the above-captioned matter came before the court for hearing on the

parties' cross-motions for partial summary judgment.  Mary Anne Q. Wood and Darryl J. Lee

appeared on behalf of the plaintiff B.J. Barnes & Sons Trucking, Inc. ("Barnes"); Matthew N.

Evans and Rob Mooney appeared on behalf of defendant Dairy Farmers of America, Inc. ("Dairy

Farmers").  At the conclusion of the hearing, the court ruled on the motions in part, taking the

remainder of the issues under advisement.  (*See* Minute Entry, dated May 12, 2006 (dkt. no. 80).)

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Barnes submits that there exists no genuine issue of material fact and that it is entitled to

judgment as a matter of law on its First Cause of Action for breach of contract, as well as Dairy

Farmers' Third, Fifth, Tenth, Sixteenth, Eighteenth and Twentieth Affirmative Defenses.  (*See*

Motion for Partial Summary Judgment, filed March 15, 2006 (dkt. no. 61).)

This action arises out of a January 22, 2003 contract between Barnes and Dairy Farmers

for the hauling of milk. By its terms, the contract was automatically renewed each year unless

one of the parties gives timely written notice of termination:

> 3.  This Agreement shall continue in full force and effect for a term of twelve (12) months commencing on the date hereof and shall be automatically renewed for additional periods of equal duration unless thirty (30) days written notice is given by either party prior to the effective date of said termination.

("Milk Hauler's Contract," dated January 22, 2003, at ¶ 3, a copy of which is annexed as Exhibit

"C" to Memorandum in Support of Motion for Partial Summary Judgment, filed March 15, 2006

(dkt. no. 62) ("Barnes Mem.").[1])

Barnes asserts that Dairy Farmers failed to comply with this provision in seeking to

terminate the contract prior to its automatic renewal as of January 22, 2005.

At a minimum, the following facts appear to exist without substantial dispute:

Dairy Farmers sent a letter dated December 6, 2004 to Barnes at its designated address

which read:

> This letter is notification from DFA/MAC Transportation that we will be re-negotiating your contract that is coming up for renewal.  I would like to set up an appointment as to when we can meet and go through some of our concerns. Please contact me at your earliest convenience so that we can get a date scheduled.

---

[1]In this instance, there appears to be no genuine dispute as to the authenticity of the documents annexed as exhibits to the summary judgment memoranda.  *See H. Sand & Co., Inc. v. Airtemp Corp.*, 934 F.2d 450, 454 (2d Cir. 1991).

Generally, documentary exhibits supporting a motion for summary judgment should be verified by sworn affidavit or declaration.  *See* Fed. R. Civ. P. 56(e); *Martz v. Union Labor Life Ins. Co.*, 757 F.2d 135, 138 (7th Cir. 1985) ("The facts must be established through one of the vehicles designed to ensure reliability and veracity--depositions, answers to interrogatories, admissions and affidavits.  When a party seeks to offer evidence through other exhibits, they must be identified by affidavit or otherwise made admissible in evidence.  6 Moore's Federal Practice P 56.11[1.-8] (2d ed. 1983)."); *Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir. 2000) (explaining that the movants' "failure to authenticate precludes consideration of their supporting documents.  Documents supporting or opposing summary judgment must be properly authenticated."); *Canada v. Blaine's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987) ("It is well settled that unauthenticated documents cannot be considered on a motion for summary judgment."); *Cummings v. Roberts*, 628 F.2d 1065, 1068 (8th Cir. 1980); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2722 at 379-84 (3d ed. 1998); *see also T.J. Smith and Nephew Ltd. v. Parke, Davis & Co.*, 623 F. Supp. 808, 813 n. 15 (D. Utah 1985) (J. Winder).

(Letter, dated December 6, 2004, a copy of which is annexed as Exhibit "D" to Barnes Mem.; *see* Barnes Mem. at v ¶ 10.[2])

On or about December 14, 2004, Dairy Farmers sent a draft contract to Barnes reflecting proposed changes.  (Barnes Mem. at v ¶ 12; Dairy Farmers Opp. Mem. at viii ¶ 12; Barnes Reply Mem. at xiv-xv ¶ 12.)  That draft was discussed by the parties at a meeting on January 18, 2005.  (Barnes Mem. at vi ¶ 13; Dairy Farmers Opp. Mem. at viii-ix ¶ 13; Barnes Reply Mem. at xv-xvi ¶ 13.)  At the conclusion of that meeting, the parties agreed "with a handshake" that Barnes would continue to haul milk for Dairy Farmers until February 1, 2005, the time of the parties' next meeting.  (Barnes Mem. at vi ¶¶ 13-14; Dairy Farmers Opp. Mem. at viii-x ¶¶ 13-14; Barnes Reply Mem. at xv-xviii ¶¶ 13-14.)

Barnes and Dairy Farmers did not conclude a modified milk hauling agreement on February 1, 2005; to the contrary, Dairy Farmers presented a letter to Barnes stating that "Dairy Farmers of America, Inc. (DFA) hereby formally notifies you of our decision to terminate our bulk milk hauling relationship with B.J. Barnes & Sons Trucking Inc. effective February 1, 2005."  (Letter, dated February 1, 2005, a copy of which is annexed as Exhibit "E" to Barnes Mem; Barnes Mem. at vi ¶¶ 14-15; Dairy Farmers Opp. Mem. at ix-xi ¶¶ 14-15; Barnes Reply Mem. at xvi-xix ¶¶ 14-15.)  Barnes ceased hauling milk for Dairy Farmers, and on April 15, 2005, commenced the above-entitled action by filing its complaint.  (Barnes Mem. at vi-vii ¶¶ 17-18; Dairy Farmers Opp. Mem. at xi-xii ¶¶ 17-18; Barnes Reply Mem. at xix-xx ¶¶ 17-18.)

---

[2]In Defendant Dairy Farmers of America, Inc.'s Opposition to Plaintiff's Motion for Partial Summary Judgment, filed April 17, 2006 (dkt. no. 71) ("Dairy Farmers' Opp. Mem.") at vii ¶ 10, counsel lists this fact as "Disputed," but offers no substantive basis for any genuine dispute, as essentially was acknowledged by counsel at the May 12th hearing.  Much the same is true of the other facts recounted herein.  (*See also* Reply Memorandum in Support of Motion for Partial Summary Judgment, filed May 4, 2006 (dkt. no. 74) ("Barnes Reply Mem."), at xiii-xx ¶¶ 10-18.)

Barnes and Dairy Farmers disagree as to the meaning and import of Dairy Farmers'
December 6th letter to Barnes as well as the facts defining the transactional context in which that
letter was sent and received.  (*See* Barnes Mem. at vii-ix ¶¶ 19-27; Dairy Farmers Opp. Mem. at
xii-xviii ¶¶ 19-27; Barnes Reply Mem. at xx-xxx ¶¶ 19-27.)

By itself, the language of the December 6th letter may not clearly and unequivocally
communicate Dairy Farmers' intent to terminate the parties' contract, but the letter cannot be
divorced from its transactional context.  The meaning of language so often depends upon the
context in which it is used, and in this case the material facts defining that context remain in
genuine dispute.  That being so, Barnes has failed to meet its initial burden to "show that there is
no genuine issue as to any material fact," Fed. R. Civ. P. 56(c), and summary judgment on
Barnes' contract claims[3] would thus be inappropriate.

Dairy Farmers has conceded that there exists no genuine triable issue as to its Sixteenth
Affirmative Defenses of laches and unclean hands, and Tenth Affirmative Defense concerning
"prior material breaches" of the contract, and Barnes' motion should be granted to that extent.
(*See* Barnes Mem. at x ¶¶ 29-31; Dairy Farmers Opp. Mem. at xix-xx ¶¶ 29-31; Barnes Reply
Mem. at xxxi-xxxiii ¶¶ 29-31.)

Dairy Farmers' Fifth Affirmative Defense, concerning a right to an offset arising from
Barnes' failure to sell its milk-hauling equipment to Dairy Farmers under the parties' lease
agreement, proves to be legally insufficient due to the absence of any express unconditional duty
on the part of Barnes to *sell* equipment to Dairy Farmers under the terms of the lease agreement,

---

[3]Both Barnes' First Cause of Action for breach of the contract's express terms and Second Cause of Action for
breach of the implied covenant of good faith and fair dealing inherent in the same contract depend upon the legal effect
of the December 6th letter and the events surrounding its transmission.  (*See* Complaint, filed April 15, 2005 (dkt. no. 1),
at 2-4 ¶¶ 1-26.)

notwithstanding Dairy Farmer's obligation as lessor to *buy* equipment that Barnes as lessee would be willing to sell.  (*See* Barnes Mem. at x-xi ¶¶ 32-34; Dairy Farmers Opp. Mem. at xx-xxi ¶¶ 32-34; Barnes Reply Mem. at xxxiii-xxxv ¶¶ 32-34; Lease of Equipment, dated April 1, 2003, at [3] ¶ 17, a copy of which is annexed as Exhibit "H" to Barnes Mem.[4])  Barnes' motion should also be granted as to Dairy Farmers' Fifth Affirmative Defense.

The Dairy Farmers' Third, Sixteenth (waiver and estoppel), Eighteenth and Twentieth Affirmative Defenses turn upon the legal significance of the December 6th letter and the January 18th negotiations and "handshake" agreement, as to which the underlying material facts remain in genuine dispute, and summary judgment must be denied.

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Dairy Farmers seeks summary judgment as to all of Barnes' pleaded claims.  (*See* Motion for Summary Judgment, filed March 15, 2006 (dkt. no. 63).)  For the reasons already explained, summary judgment must be denied as to Barnes' First and Second Causes of Action alleging breach of contract.

### Barnes' Defamation Claim

At the May 12th hearing, this court granted the Dairy Farmers' motion as to Barnes' Fourth Cause of Action, alleging a claim for defamation.  (*See* Minute Entry, dated May 12, 2006 (dkt. no. 81).)  Though Barnes' assertions at this stage are not purely conclusory and for that

---

[4]Paragraph 17 of the lease agreement reads:

> 17.  If Lessee purchases tractors or trucks, and Lessor, or Lessee terminates the milk haul contract, The Lessor shall be obligated to purchase that equipment based on a fair market value to be agreed by both parties.  If a mutual agreement cannot be reached as to fair market value, each party shall agree on an independent appraisal to establish the value of the peace [sic] of equipment.

(Exhibit "H" to Barnes Mem. at [3] ¶ 17.)

reason legally insufficient, *cf. Zoumadakis v. Uintah Basin Medical Center, Inc.*, 2005 UT App

325, ¶ 3, 122 P.3d 891, 892-93, the "numerous undisputed defamatory statements" alleged by

Barnes involved predictions by Dairy Farmers' personnel as to future events (*e.g.*, that "the

parties' Contract would not be renewed and that B.J. Barnes would soon cease hauling milk for

DFA"), or expressions of subjective opinion (*e.g.*, that Barnes "was not doing a very good job"),

including generalized attributions of fault (*e.g.*, that "all of the problems" experienced by Dairy

Farmers' individual milk producers "were the fault of B.J. Barnes").  (Plaintiff's Memorandum

of Points and Authorities in Opposition to DFA's Motion for Summary Judgment, filed April 17,

2006 (dkt. no. 70) ("Barnes Opp. Mem."), at xiii-xvi ¶¶ 11-16; *id.* at 2-3.[5])

> In order to state a claim for defamation under Utah law, a plaintiff must
> show "that defendants published the statements concerning him [either in print or
> by spoken words], that the statements were false, defamatory, and not subject to
> any privilege, that the statements were published with the requisite degree of fault,
> and that their publication resulted in damage."  *West,* 872 P.2d at 1007-08
> (footnotes omitted).

*Wayment v. Clear Channel Broadcasting, Inc.*, 2005 UT 25, ¶ 18 n.2, 116 P.3d 271, 278 n. 2.  To

be demonstrably "true" or "false," the published statements must be statements of *fact*, not mere

---

[5]Dairy Farmers replies that the alleged statements recounted by Barnes in its papers constitute inadmissible hearsay, were not defamatory, and in any event, may never have been communicated to anyone.  (*See* Reply Memorandum in Support of Motion for Summary Judgment, filed May 4, 2006 (dkt. no. 75) ("Dairy Farmers' Reply Mem."), at 1-2, 3-6.)

"In opposing a motion for summary judgment, the nonmovant must make a showing that, 'if reduced to admissible evidence,' would be sufficient to carry the nonmovant's burden of proof at trial."  *Committee for the First Amendment v. Campbell*, 962 F.2d 1517, 1526 n.11 (10th Cir. 1992) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)).  The nonmoving party must adduce admissible evidence to demonstrate that there are genuine issues of material fact which preclude entry of summary judgment, for it is clear that "only admissible evidence  may be considered by the trial court in ruling on a motion for summary  judgment."  *Beyene v. Coleman Security Systems Services, Inc.*,  854 F.2d 1179, 1181 (9th Cir. 1988).  *Accord, Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991); *Jones v. Wilkinson*, 800 F.2d 989, 1002 (10th Cir. 1986) (stating that "Fed.R.Civ.P. 56  . . . requires  that material supporting a motion for summary judgment be admissible  evidence"); *World of Sleep, Inc. v. Lay-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985) ("Under Fed.R.Civ.P. 56(e), the court may consider only admissible evidence in ruling on a motion for summary judgment."); *H.B. Zachry Co. v. O'Brien*, 378 F.2d 423, 425 (10th Cir. 1967).

opinion or belief.[6]  Under Utah law, "a statement is defamatory if it impeaches an individual's

honesty, integrity, virtue, or reputation and thereby exposes the individual to public hatred,

contempt, or ridicule."  *West,* 872 P.2d at 1008.  By itself, "[c]riticism" generally "is not

defamatory."  *Id.* at 1010.

"Inasmuch as the complaint contains no allegation of special damages, in order to state a

claim upon which relief can be granted," the statements that Barnes attributed to Dairy Farmers

"must constitute defamation *per se.*"  *Baum v. Gillman*, 667 P.2d 41, 42 (Utah 1983) (footnote

omitted).  Indeed, Barnes' Fourth Cause of Action was pleaded explicitly as an action for

defamation *per se*.  (*See* Complaint (dkt. no. 1), at 5-6 ¶¶ 32-35.)

> In order to constitute defamation *per se,* the defamatory words must charge
> criminal conduct, loathsome disease, conduct that is incompatible with the
> exercise of a lawful business, trade, profession, or office, or the unchastity of a
> woman.  Whether the defamatory words are actionable *per se* is to be determined
> from their injurious character. The words must be of such common notoriety that
> damage can be presumed from the words alone.

*Baum*, 667 P.2d at 43 (footnotes omitted).  A statement constitutes defamation *per se* when

"'language is used concerning a person or his affairs which from its nature necessarily must, or

presumably will, as its natural and proximate consequence, occasion him pecuniary loss,'" *id.*

(quoting *Nichols v. Daily Reporter Co.,* 30 Utah 74, 83 P. 573, 574 (1905) (citations omitted)),

and  "'[e]xcept where this presumption exists, special damages to the plaintiff's reputation must

be alleged and proved to have been the actual and natural result of the language used.'"  *Id.*

(quoting *Nichols*).

---

[6]*West v. Thomson Newspapers*, 872 P.2d 999, 1015 (Utah 1994) ("Because expressions of pure opinion fuel the
marketplace of ideas and because such expressions are incapable of being verified, they cannot serve as the basis for
defamation liability.").

As one noted commentary observes, "The law has always been very tender of the reputation of tradesmen," but even so, to constitute defamation *per se*, "words spoken of them in the way of their trade" must be "of a kind incompatible with the proper conduct of the business, trade, profession or office itself.  The statement must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities, where such special significance is lacking."  William L. Prosser, *Handbook of the Law of Torts* 757, 758 (4th ed. 1971).  Under Utah law, "the type of statement required for the purposes of defamation *per se* with respect to the practice of a trade or profession necessarily must, as its natural and proximate consequence, compel the conclusion that plaintiff will be damaged." *Larson v. SYSCO Corp.*, 767 P.2d 557, 560 (Utah 1989) (citing *Baum*, 667 P.2d at 43) (concluding that an employer's notation indicating "poor performance" as the reason for plaintiff's termination from employment "cannot be considered a statement which will necessarily injure his trade or profession" for purposes of defamation *per se*).

Here, even assuming that they could be "reduced to admissible evidence" in support of Barnes' claim at trial, *Celotex*, 477 U.S. at 327, none of the statements alleged in the complaint, or set forth in Barnes' summary judgment memorandum, are such as would compel the court to legally presume that Barnes has been damaged because "they clearly do not impute criminal conduct, loathsome disease, conduct incompatible with the exercise of a lawful business or unchastity." *Baum*, 667 P.2d at 43.  Nor do they impute fraud, dishonesty, insolvency, or "a want of credit or integrity."  *Nichols*, 83 P. at 575; *Atlas Sewing Center, Inc. v. National Ass'n of Indep. Sewing Mach. Dealers*, 260 F.2d 803, 806-07 (10th Cir. 1958) (false advertising and deceptive practices attributed to plaintiff and fraud imputed to plaintiff's salesmen); *Simpson v.*

*Steen*, 127 F. Supp. 132, 137 (D. Utah 1954) (J. Christenson) (fraud and dishonesty imputed to plaintiffs as mining "claim jumpers").

In *WKB Enterprises, Inc. v. Ruan Leasing Co.*, 838 F.Supp. 529 (D. Utah 1993), a case cited by Barnes, Judge Anderson concluded that the defendant's false statement that plaintiff was delinquent in its lease payments on a nonexistent lease did not constitute defamation *per se*, and that "special damages must be shown to win on defamation."  838 F. Supp. at 534.  Here, as in *WKB Enterprises*, "[s]uch damages have not been shown, and summary judgment in favor of [the defendant] on the defamation cause of action is appropriate."  *Id.* at 535.

### Intentional Interference with Prospective Economic Advantage

Barnes' Third Cause of Action alleges that Dairy Farmers has engaged in "conduct constituting tortious interference with B.J. Barnes' prospective economic advantage," including (1) "a pattern of conduct . . . designed to damage B.J. Barnes' reputation with its customers, vendors and drivers[;]" (2) that after February 1, 2005, Dairy Farmers "hired B.J. Barnes' drivers so that B.J. Barnes would not be able to continue hauling milk or provide over-the-road driving services[;]" and (3) that Dairy Farmers has "interfered with B.J. Barnes' attempts to sell equipment and acquire other customers."  (Complaint (dkt. no. 1), at 5 ¶¶ 29-31; *see* Memorandum in Support of Motion for Summary Judgment, filed March 15, 2006 (dkt. no. 64) ("Dairy Farmers' Mem."), at iii-v ¶¶ 1-5.)  In its discovery responses and summary judgment papers, Barnes has enlarged this claim to include the allegations that Dairy Farmers "refused to permit" Barnes "to enter into a milk hauling contract" with Utah Dairy Farmers, "another milk producer," and Bateman Masada Dairy; and that Dairy Farmers interfered through its "untimely notice of termination of the Contract" and by "purport[ing] to negotiate the Contract when it

-9-

really had no intention to do so."  (Barnes Opp. Mem. at xvi-xxi ¶¶ 18-38 & Exhibits "D," "E.")

"The tort of intentional interference with prospective economic relations reaches beyond protection of an interest in an existing contract and protects a party's interest in prospective relationships of economic advantage not yet reduced to a formal contract (and perhaps not expected to be)."  *Leigh Furniture and Carpet Co. v. Isom,* 657 P.2d 293, 302 (Utah 1982) (citing *Buckaloo v. Johnson,* 14 Cal.3d 815, 537 P.2d 865, 868-69, 122 Cal.Rptr. 745, 748-49 (1975);  *Restatement (Second) of Torts* § 766B comment c;  Prosser, *supra,* at § 130).  In the *Leigh* case, the Utah Supreme Court recognized "a common-law cause of action for intentional interference with prospective economic relations," and adopted the Oregon definition of this tort. *Id.* at 304 (citing *Straube v. Larson,* 287 Or. 357, 361, 600 P.2d 371, 374 (1979);  *Top Service Body Shop, Inc. v. Allstate Insurance Co.,* 283 Or. 201, 205, 209, 582 P.2d 1365, 1368, 1371 (1978)).  "Under this definition, in order to recover damages, the plaintiff must prove (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff."  *Id.*  The improper means element is satisfied when "the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common-law rules.  Such acts are illegal or tortious in themselves and hence are clearly 'improper' means of interference. . . ."  *Id.* at 308.

The question of interference for an "improper purpose" or by an "improper means" requires the weighing of several relevant factors:

> In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,
(b) the actor's motive,
(c) the interests of the other with which the actor's conduct interferes,
(d) the interests sought to be advanced by the actor,
(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
(f) the proximity or remoteness of the actor's conduct to the interference and
(g) the relations between the parties.

*Restatement (Second) of Torts* § 767(a)-(g) (1979); *see Mumford v. ITT Commercial Finance Corp.*, 858 P.2d 1041, 1044 n.4 (Utah Ct. App. 1993) (citing *Restatement (Second) of Torts* § 767 factors).  As the *Leigh* court observed:

> In the rough and tumble of the marketplace, competitors inevitably damage one another in the struggle for personal advantage.  The law offers no remedy for those damages—even if intentional—because they are an inevitable byproduct of competition.  Problems inherent in proving motivation or purpose make it prudent for commercial conduct to be regulated for the most part by the improper means alternative, which typically requires only a showing of particular conduct.
>
> The alternative of improper purpose will be satisfied where it can be shown that the actor's predominant purpose was to injure the plaintiff. . . .

657 P.2d at 307 (footnote & citations omitted).

From the arguments presented, it appears that Barnes contends that Dairy Farmers has interfered with Barnes' prospective economic advantage by "improper means." (*See* Barnes Opp. Mem. at xvi-xxi ¶¶ 18-38; *id.* at 4-8 & Exhibits "D," "E.") Yet Barnes offers no analysis of its allegations in light of the specific factors identified in § 767 of the *Restatement* as bearing upon the question of improper means.

As one "improper means," Barnes argues that Dairy Farmers breached its milk hauling contract with Barnes in several respects, *viz.*, by "arbitrarily terminating, and thus breaching its

Contract";[7] by refusing to renegotiate that contract at the February 1, 2005 meeting; by "reporting that the Contract would not be renewed and that B.J. Barnes would soon cease hauling milk" for Dairy Farmers; and by "prevent[ing] B.J. Barnes from hauling milk" for other producers. (Barnes Opp. Mem. at 4-8.)  Barnes also argues that Dairy Farmers used its "arbitrary" termination of its contract with Barnes as an opportunity to hire away Barnes' at-will employee drivers.  (*Id.*)

As to whether Dairy Farmers breached the terms of its contract with Barnes in giving written notice of termination prior to its automatic renewal on January 22, 2005, there exist genuine issues of material fact that make summary judgment inappropriate as to Barnes' claims of breach of contract.

Moreover, Barnes cites no controlling authority directly supporting the proposition that one party's giving of notice of termination of a contract—"arbitrary" or not, timely or untimely—amounts to *tortious* interference with the other party's prospective economic advantage flowing from the continuation of that contract without termination,[8] at least absent

---

[7]*Leigh* suggests that a party to a contract has an "implied duty to exercise all of its rights under the contract reasonably and in good faith."  657 P.2d at 311 (citing *Cahoon v. Cahoon*, 641 P.2d 140, 144 (Utah 1982); *Rio Algom Corp. v. Jimco Ltd.*, 618 P.2d 497, 505 (Utah 1980); *Ferris v. Jennings*, 595 P.2d 857, 859 (Utah 1979)).

[8]Breach of contract, by itself, is not an "intentional interference" tort.  *Cf. Leigh*, 657 P.2d at 301, 309:

It is settled that one party to a contract cannot be liable for the tort of interference with contract for inducing a breach by himself or the other contracting party. *Dryden v. Tri-Valley Growers*, 65 Cal. App. 3d 990, 998, 135 Cal. Rptr. 720, 725-26 (1977); *Cuker Industries, Inc. v. William L. Crow Construction Co.*, 6 A.D.2d 415, 178 N.Y.S.2d 777 (1958); *Houser v. City of Redmond*, 91 Wash.2d 36, 39, 586 P.2d 482, 484 (1977); *Kvenild v. Taylor*, Wyo., 594 P.2d 972, 977 (1979).
. . . .
       A deliberate breach of contract, even where employed to secure economic advantage, is not, by itself, an "improper means."  Because the law remedies breaches of contract with damages calculated to give the aggrieved party the benefit of the bargain, there is no need for an additional remedy in tort (unless the defendant's conduct would constitute a tort independent of the contract).

(continued...)

-12-

significant probative admissible evidence of an improper purpose on the part of the party seeking to terminate.  *Cf. Buxbom v. Smith*, 23 Cal.2d 535, 548, 145 P.2d 305, 311 (1944) (stating that a breach of  contract may be "wrongful when intentionally utilized as the means of depriving plaintiff of his employees").

The *Leigh* court observed that "[i]n combination, a breach of contract and an intent to injure satisfy the improper means requirement for the cause of action for intentional interference with prospective economic relations," 657 P.2d at 311,[9] but it did so in the context of one party's breach of its contractual *duty* to approve the other party's potential business partners and subtenants, and its refusal of the other party's tender of the balance of the purchase price for the building in question.  *Id.*  Barnes cites to *Gull Laboratories, Inc. v. Diagnostic Technology, Inc.*, 695 F. Supp. 1151 (D. Utah 1988), in which Judge Anderson observed that "if a party breaches its contract for the purpose of damaging the other party's business and to obtain a personal advantage over that business, then a cause of action does exist for intentional interference with prospective economic relations."  695 F. Supp. at 1154 (citing *Leigh*, 657 P.2d at 311).  But Judge Anderson did not have occasion to apply that principle in *Gull Laboratories* because he found the contract in that case to be illusory and unenforceable.

Even more than "arbitrary," *Leigh* and *Gull Laboratories* indicate a breach of contract

---

[8](...continued)
        Neither a deliberate breach of contract nor an immediate purpose to inflict injury which does not predominate over a legitimate economic end will, by itself, satisfy this element of the tort. . . . .

    [9]As *Leigh* elaborates, "contract damages provide an insufficient remedy for a breach prompted by an immediate purpose to injure, and that purpose does not enjoy the same legal immunity in the context of contract relations as it does in the competitive marketplace.  As a result, a breach of contract committed for the immediate purpose of injuring the other contracting party is an improper means that will satisfy this element of the cause of action for intentional interference with economic relations."  657 P.2d at 309.

generally must be *purposeful* to be actionable in tort as an intentional interference with the prospective economic advantages of the non-breaching party.[10]  Yet Barnes has proffered no significant probative admissible evidence showing that Dairy Farmers acted with a wrongful or improper purpose to injure Barnes' business, and not in furtherance of its own long-term economic interests.[11]

Nor does one party's refusal to renegotiate a contract that it seeks to terminate—even after initiating such negotiations—appear to tortiously interfere with the other party's economic interest in reaching a new agreement.  Contractual relationships, whatever their prospective economic advantages for each party may be, are not formed in perpetuity—particularly where the express terms of the contract afford the parties an unconditional right to terminate the contract upon proper notice to the other.

Apart from Dairy Farmers' alleged breach of its contract with Barnes, Barnes also alleges interference with Barnes' prospective economic relationships with third-party milk producers and Barnes' own employees.

Under the terms of its milk hauling contract, Dairy Farmers' relationship with Barnes was not exclusive as to Barnes.  Paragraph 2(d) of the contract provides that "Hauler may, at its sole discretion, provide transportation services to others after providing sixty (60) days prior written

---

[10]*Cf.  Mumford v. ITT Commercial Finance Corp.*, 858 P.2d 1041, 1044 (Utah Ct. App. 1993):

> The tort of interference with economic relations is an intentional tort.  However, even if the defendant does not act for the purpose of interfering or does not desire it but knows that the interference is substantially certain to occur as a result of defendant's action and is a necessary consequence thereof, the interference is intentional.  Restatement, *supra*, § 766A cmt. e and § 766B cmt. d; *accord Straube v. Larson*, 287 Or. 357, 600 P.2d 371, 374 (1979).

[11]*Cf. Leigh*, 657 P.2d at 309 n.10 ("Likewise, . . . a party whose immediate purpose is to inflict injury does not satisfy the element of 'improper purpose' so long as the long-range or predominant purpose is to further a legitimate economic end.").

notice of the same" to Dairy Farmers.  ("Milk Hauler's Contract," dated January 22, 2003, at ¶ 2(d), a copy of which is annexed as Exhibit "C" to Barnes Mem., and as Exhibit "J" to Barnes Opp. Mem.)  This provision confirmed Barnes' right to haul milk for third parties after notice to Dairy Farmers and conferred no duty or power on Dairy Farmers to approve Barnes' service relationships with third parties.  Paragraph 2(d) was a contract right for Barnes to exercise, not a promise for Dairy Farmers to perform, or even to breach.  Dairy Farmers could not "breach" Paragraph 2(d) by importuning Barnes not to haul milk for others.  Dairy Farmers could ask,[12] cajole, admonish—even implore—Barnes not to haul milk for others,[13] but under the contract, it remained within Barnes' "sole discretion" to decide whether to exercise its right under Paragraph 2(d) to haul milk for others, or to forbear.

Concerning Barnes' employees, Dairy Farmers acknowledges that it hired drivers that had been working for Barnes prior to its cessation of milk hauling for Dairy Farmers on and after February 1, 2005.  But Dairy Farmers points out that Barnes' drivers were "at-will" employees who were free to leave their existing jobs for new employment as they chose, and that in any event, Barnes acknowledges that it had terminated the employment of many of its drivers upon the February 1, 2005 end of hauling for Dairy Farmers.  (*See* Dairy Farmers' Mem. at iii-v ¶¶ 2-4; *id.* at 2-3; Barnes Opp. Mem. at iv-xi ¶¶ 2-4; *id.* at xx ¶ 36.)

---

[12]"Asking one of [Dairy Farmers'] large haulers not to haul for a competitor has a legitimate purpose and is not contrary or in violation of any statute or regulation."  (Dairy Farmers' Mem. at 4.)

[13]According to Barnes, Dairy Farmers "'clearly told Plaintiff not to accept that work,'" that it "refus[ed] to allow B.J. Barnes to enter into a milk hauling agreement with the Utah Dairy Farmers," (Barnes Opp. Mem. at ix ¶ 5), and that Dairy Farmers "would not even submit the issue to its transportation committee," thus "precluding any avenue for B.J. Barnes to exercise its contractual right to haul milk for others."  (*Id.* at xvii ¶21; *id.* at 5.)

On its face, at least, nothing in the milk hauling contract required that the exercise of Barnes "sole discretion" under Paragraph 2(d) be "submitted" to Dairy Farmers' "transportation committee," for approval or otherwise.  (Barnes Opp. Mem. at 5-6; *see id.* at Exhibit "K," pp. 271-76.)

Barnes responds that even before many drivers were laid off, Dairy Farmers had

"intentionally interfered with B.J. Barnes' relationship with its drivers by reporting that B.J.

Barnes' Contract with [Dairy Farmers] would not be renewed, prominently placing signs on the

gate and in the [Dairy Farmers] office windows stating that [Dairy Farmers] was now hiring

drivers," and by "arbitrarily terminating the Contract" with Barnes.  (Barnes Opp. Mem. at vii-

viii ¶ 2; *see id.* at xx ¶ 36 ("Immediately following DFA's termination of the Contract, DFA

placed signs on its door saying, 'DFA is now hiring drivers.'  B.J. Barnes' drivers were required

to turn at that door in order to enter B.J. Barnes' office.").)

"A claim for intentional interference with prospective economic relations is established

'when interference resulting in injury to another is wrongful by some measure beyond the fact of

the interference itself.'"  *Mumford v. ITT Commercial Finance Corp.*, 858 P.2d at 1043 (quoting

*Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201, 582 P.2d 1365, 1371 (1978) (en

banc)).  Barnes offers no persuasive explanation as to how Dairy Farmers' hiring of drivers could

tortiously interfere with "at-will" employment relationships that Barnes itself had ended.  It

violated no statute, regulation or settled common-law rule to seek to hire drivers, and Dairy

Farmers' solicitations of Barnes' drivers were not "illegal or tortious in themselves."  Barnes has

failed to establish a genuine issue of material fact concerning the "improper means" element of

its Third Cause of Action concerning Dairy Farmers' hiring of Barnes' drivers, particularly after

Barnes itself had ended their "at-will" employment on and after February 1, 2005.

Barnes also reiterated its allegations of defamatory statements in the context of its

intentional interference claim.  (*See* Barnes Opp. Mem. at ix-x ¶ 6; *id.* at xviii ¶ 26 ("DFA

representatives also made numerous statements to producers, customers and drivers blaming B.J.

Barnes for problems with the quality of milk and milk pickups, and indicating that B.J. Barnes was not a competent milk hauler.") (citing *id.* at xiii-xv ¶¶ 11-13).)  These allegations prove to be beset by the same substantive weaknesses under the Third Cause of Action that plagued them under the Fourth Cause of Action, including a lack of significant probative admissible evidence as to actual injury and damage caused by the alleged statements.

Finally, Barnes asserts that Dairy Farmers wrongfully interfered with Barnes' attempts to sell certain transportation equipment, allegedly resulting in a $72,500 loss on the sale.  (Barnes Opp. Mem. at xxi ¶¶ 37-38; *id.* at Exhibit "A," pp. 231-32; *id.* at Exhibit "B," pp. 164-68.) Barnes' allegations in this regard remain largely conclusory, and even the deposition testimony proffered by Barnes does not suffice as significant probative admissible evidence establishing each essential element of the cause of action.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[T]he plaintiff could not rest on his allegations of a conspiracy to get to a jury without 'any significant probative evidence tending to support the complaint'") (quoting *First National Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 290 (1968)).  Under Rule 56, "the nonmoving party must, at a minimum, direct the court to facts which establish a genuine issue for trial.  In the face of a properly supported motion for summary  judgment, the nonmoving party may not rely upon unsupported allegations without 'any significant  probative  evidence tending to support the complaint.'"  *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 259).[14]

---

[14]Recalling language in *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290 (1968), cautioning that a litigant's "right" to have a trial on its pleaded claims does not entitle the litigant "to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint," *Anderson* instructed that "[i]f the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted.' 477 U.S. at 249-50 (citations omitted).  The Tenth Circuit has since incorporated this expression in defining the non-

(continued...)

-17-

Dairy Farmers did not wrongfully refuse Barnes access to Barnes' trucking equipment, as the plaintiff had alleged in *Mumford v. ITT Commercial Finance Corp.*, a case cited by Barnes. Barnes relies upon the hearsay assertion that a Dairy Farmers employee made inquiry of Barnes' prospective purchaser of its trucks as to the status of the purchase and suggested that he purchase trailers from Barnes as well.  (Barnes Opp. Mem. at xxi ¶ 37.)

Remembering the *Leigh* court's admonition that "[i]n the rough and tumble of the marketplace, competitors inevitably damage one another in the struggle for personal advantage," and that "[t]he law offers no remedy for those damages—even if intentional—because they are an inevitable byproduct of competition," 657 P.2d at 307, this court concludes that Barnes' barely colorable allegations of intentional interference with its attempts to resell its trucking equipment, like its allegations as to Dairy Farmers' interference with Barnes' hauling for other producers, its hiring of Barnes' drivers, or its defamation of Barnes' business, do not raise a genuine issue of material fact and cannot survive Dairy Farmer's motion for summary judgment as to Barnes' Third Cause of Action.  To that extent, Dairy Farmers' motion should be granted.

Whether Barnes can demonstrate that Dairy Farmers breached the terms of its milk

---

[14](...continued)

moving party's standard of proof under Rule 56(c): "It is not enough that the nonmovant's evidence be 'merely colorable' or anything short of 'significantly probative.'"  *Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550 (10th Cir. 1993) (quoting *Anderson*).  Thus, 'significant probative evidence' is required to raise a 'genuine issue of material fact" defeating summary judgment.  *See Lake Hefner Open Space Alliance v. Dole*, 871 F.2d 943, 945 (10th Cir. 1989) (nonmoving party "must set forth specific facts showing the presence of  a genuine issue of material fact for trial *and significant probative evidence supporting the allegations*" (emphasis added)); *Committee for the First Amendment v. Campbell*, 962 F.2d at 1526 n.11 ("summary judgment evidence must be beyond colorable; it must be significantly probative").

   If the non-moving party fails to make this showing with respect to any element essential to its case and on which it bears the burden of proof at trial, then the moving party is entitled to summary judgment "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'  *Celotex*, 477 U.S. at 323.

*Jensen v. Kimble*, 1 F.3d 1073, 1077 (10th Cir. 1993).

hauling contract, and if so, that Dairy Farmers did so "for the purpose of damaging the other

party's business and to obtain a personal advantage over that business," *Gull Laboratories*, 695

F. Supp. at 1154 —thereby establishing a factual footing for its cause of action for intentional

interference with prospective economic relations arising from the breach—remains a matter for

further consideration in the context of the pretrial conference, and possibly, by the trier of fact.

**CONCLUSION**

Given the obvious continuing disputes between Barnes and Dairy Farmers as to meaning

and context, the May 12th hearing served as much as a preliminary pretrial conference as it did a

hearing on cross-motions for partial summary judgment, with court and counsel engaged in an

effort to identify and narrow the genuine issues requiring a trial.  *See* Fed. R. Civ. P. 16(c)(1)

("At any conference under this rule, consideration may be given, and the court may appropriate

action, with respect to (1) the formulation and simplification of the issues, including the

elimination of frivolous claims or defenses; . . . ."); Fed. R. Civ. P. 56(d); *see generally*

*MacArthur v. San Juan County*, 416 F. Supp. 2d 1098, 1112-14 (D. Utah 2005).  That

winnowing process will continue as to the parties' remaining claims and defenses in the context

of the Final Pretrial Conference, now calendared for June 1, 2006 at 9:30 a.m.

At this point, this court has concluded that, with the exception of a possible claim for

intentional interference with Barnes' prospective economic advantage grounded upon Dairy

Farmers' alleged breach of its milk hauling contract with Barnes, Dairy Farmers is entitled to

judgment in its favor as a matter of law as to Barnes' Third and Fourth Causes of Action for

intentional interference and defamation, respectively.  In turn, Barnes is entitled to judgment in

its favor as a matter of law as to Dairy Farmers' Fifth Affirmative Defense, its Tenth Affirmative

Defense, and  its Sixteenth Affirmative Defenses of laches and unclean hands.

From the record now before this court, it appears that there exist genuine issues of material fact as to Barnes' First and Second Causes of Action for breach of contract, and as to Dairy Farmers' Third, Sixteenth (waiver and estoppel), Eighteenth and Twentieth Affirmative Defenses, and as to these matters, the parties' cross-motions for partial summary judgment must be denied.

For the reasons explained above,

**IT IS ORDERED** that plaintiff B.J. Barnes & Sons Trucking, Inc.'s Motion for Partial Summary Judgment (dkt. no. 61), is hereby GRANTED IN PART as to defendant Dairy Farmers of America, Inc.'s  Fifth Affirmative Defense, Tenth Affirmative Defense, and  Sixteenth Affirmative Defenses of laches and unclean hands; plaintiff's motion is hereby DENIED in all other respects;

**IT IS FURTHER ORDERED** that defendant Dairy Farmers of America, Inc.'s Motion for Summary Judgment (dkt. no. 63), is GRANTED IN PART as to plaintiff B.J. Barnes & Sons Trucking, Inc.'s Third Cause of Action (excepting intentional interference with prospective economic advantage caused by defendant's alleged breach of its contract), and Fourth Causes of Action; defendant's motion is DENIED in all other respects;

**IT IS FURTHER ORDERED** that defendant Dairy Farmers of America, Inc.'s Motion to Strike Portions of the Affidavit of Michael Cherniske, filed May 4, 2006 (dkt. no. 76), is

hereby GRANTED.

DATED this _19_ day of May, 2006.

BY THE COURT:

BRUCE S. JENKINS
United States Senior District Judge